(No. 476█

AMERICAN STATES INSURANCE COMPANY AND UNION AUTOMOBILE INDEMNITY ASSOCIATION, Claimants, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed March 26, 1959.*

BURRELL AND HOLTAN, Attorneys for Claimants.

LATHAM CASTLE, Attorney General; SAMUEL J. DOY, Assistant Attorney General, for Respondent.

48

WHAM, J.

Claimants bring this action to recover on their respective subrogation claims for damages arising out of an automobile collision.

On August 29, 1955, one Mike DeSimone, a sixteen year old inmate of the Savanna Encampment of the St. Charles Boys Reformatory, and another inmate, Ronald Chiquet, also sixteen years of age, escaped, took unlawful possession of a Pontiac automobile belonging to Harold Schroeder at Savanna, Illinois, and, while being pursued by the police, collided with a parked Oldsmobile automobile owned by Dr. L. B. Hussey in Savanna, causing damages to both vehicles, which were insured for collision loss.

Claimant, American States Insurance Company, was the insurer of the Schroeder automobile, which was damaged in the amount of $668.50, and claimant, Union Automobile Indemnity Association, was the insurer of the Hussey automobile, which was damaged in the amount of $1,915.00.

Claimants contend that the State of Illinois was negligent in failing to control the activities of its wards, and should respond in damages.

Respondent does not dispute the facts set forth above, the amount of damages sustained, nor that claimants are the proper parties in interest. Respondent contends, however, that the State of Illinois was guilty of no negligence

proximately causing the damages, and that, therefore, no recovery should be allowed.

The Illinois Youth Commission, in accordance with the provisions of Chap. 23, Par. 372a, Ill. Rev. Stats. (1955 State Bar Association Edition), conducted an investigation of the occurrence. The report of the investigation was offered by claimants as their exhibit No. 1. The Commission in its report found that the damages claimed had been caused by the two escaped inmates, and recommended as follows: "It is our opinion that claimants in this case are entitled to compensation for the damages to their property as a result of the actions of Michael DeSimone and Ronald Chiquet, wards of the Illinois Youth Commission, who were assigned to the Mississippi Palisades State Boys' Camp at Savanna, Illinois."

In studying the report of the Commission, we note that no facts bearing on the disputed question of negligence appear, and, consequently, the recommendation must first be considered in the light of the evidence brought out at the hearing before being either accepted or rejected by this Court.

As we stated in the case of the *Dixon Fruit Company, Et Al* vs. *State of Illinois,* No. 4662, with respect to the effect of a commission's or department's recommendation for or against the allowance of such a claim, or the lack of such a recommendation, "The statute provides that the defendant shall make an investigation, and *'may recommend to the Court of Claims that an award be made to the injured party, and the Court of Claims shall have the power to hear and determine such claim'.* If the Legislature intended the department (or commission) to be the final arbiter, there would be no reason

to refer the matter to the Court of Claims. We think rather the Legislature intended that the department could recommend favorable consideration, if it saw fit, and the Court of Claims would be entitled to either accept such recommendation, or at least take it into consideration. We do not believe, however, that, because of the lack of a favorable recommendation, the Court of Claims could not hear and determine the claim itself."

Conversely, the fact that a favorable recommendation is made is likewise not binding upon this Court, but may be considered in the light of the evidence.

As to the applicable test by which this claim is to be judged, we stated in the above case: "The statute does not spell out the test to be applied, but it is significant to note that nowhere in the statute is there any wording, which specifically directs the Court of Claims to apply the test of absolute liability. Such direction being absent, we will not presume that the Legislature so intended. It is more reasonable to presume that the Legislature intended the Court to utilize some discretion, and we, therefore, until otherwise directed by the Legislature, will allow claims under the statute only in the event that we find the State to have been at fault."

Each of these escape cases rests upon their own peculiar set of facts and circumstances.

In the Dixon Fruit Company case we allowed a recovery for the burning of a truck by an escaped inmate of the Dixon State School, who was a known mental defective with an exhibited tendency toward incendiarism, and who was allowed to wander at will without supervision in an institution wherein there were no restraining walls or other means of controlling his movements. We felt that there was a sufficient showing of negligence in

that the State of Illinois should have foreseen the consequences, inasmuch as the institution's location was within the city of Dixon where property of many persons would be jeopardized by the activities of such a patient. We felt that the State of Illinois exposed the public to an unreasonable risk.

We have recently allowed a recovery in the case of *Martha Callbeck* vs. *State of Illinois,* No. 4612, for personal injuries sustained by a female employee living on the grounds of the Chicago State Hospital, an institution operated by the State for the mentally ill, when assaulted in her quarters on the grounds in the early morning hours by a dangerous homicidal patient, who had been allowed to go at large upon the grounds in the darkness without surveillance.

In a case similar to that last cited, the Court in *Mary Malloy* vs. *State of Illinois,* 18 C.C.R. 137, allowed a recovery for a female person assaulted by a criminally insane prisoner, who had escaped, because of insufficient surveillance from the Illinois Security Hospital.

In each of the above cases, the wards of the State were clearly dangerous mental defectives, and not of the type that should have been permitted to roam unattended, but rather should have been subjected to close surveillance at all times. The precise consequences of the State's failure to control their activities should have been foreseen by those in whose custody they were committed.

Here, however, the evidence does not disclose such a situation.

The facts respecting the confinement of DeSimone reflect that he had been committed to the custody of the Illinois Youth Commission in the latter part of 1953 at the age of fourteen. He was the product of a disoriented

home life, his parents were divorced, he had run away from home, had been placed in an orphanage, and had been brought before the County Court of Cook County after having run away from the orphanage, lived as a vagrant, and stolen a bicycle. His assignment to the Illinois Youth Commission was brought about because of the placement problem presented.

Joseph Patrick Munday, Superintendent of the Division of Forestry Camps for the Illinois Youth Commission, testified that he first met DeSimone when he was in the custody of the Family Court as a dependent child in 1951, when DeSimone was twelve years of age. He was under the care of the Family Court for approximately eight to nine years primarily because of his home situation. He again met DeSimone as parole officer for the Illinois Industrial School for Boys at Sheridan, Illinois.

DeSimone had originally been assigned by the Youth Commission to the Illinois State Training School for Boys at St. Charles. He had been transferred to the Industrial School for closer and more controlled confinement, and to help prepare him for parole eligibility.

After consideration of his case by Mr. Munday and the Superintendent of that institution, it was determined that DeSimone had progressed to a point where he was ready for an open type institution. He was transferred to the Savanna Encampment by order of the Youth Commission upon the recommendation of Mr. Munday and the Superintendent, which recommendation was based upon his record, including approximately fifteen months at the Sheridan Industrial School. This transfer took place in May of 1955, and, according to the testimony of Mr. Munday, his adjustment was "fair to average".

He was disturbed by the approaching electrocution

of his older brother for murder, and Mr. Munday had, with his knowledge, arranged for him to visit his brother in the Cook County jail. This visit was scheduled for the week following his escape.

Mr. Munday had seen and talked with DeSimone on numerous occasions after his transfer, and as late as approximately 10 A. M. on the morning of the escape. He had arranged a duty assignment for DeSimone in the camp area, so that the camp counsellor would be able to work closely with him and help him, because of his known disturbance over the approaching electrocution. Mr. Munday testified that "the furtherest thought from my mind was his running away".

Claimant contends that a notation taken from De-Simone's record placed the authorities on notice that DeSimone was preparing to escape. In an unsigned memorandum, dated July 28, 1955, claimant's exhibit No. 2, it was noted along with a general review of his progress at the encampment, "It has been reported that Mike was going to run away, but this never came to actuality".

When this notation is taken into consideration with the fact that he had been in the encampment for more than two months prior and one month subsequent to the date of the memorandum without making any attempt to escape, and when such notation was apparently no more than reported rumor at the time it was made, we cannot find that any such notice should be charged to the State from this notation. To hold otherwise on this question would have the end result of requiring the State to transfer such an inmate back to the Industrial School immediately upon the receipt of any like rumor, or keep the inmate at the State's peril from that time on. Obviously, such a policy would be neither wise nor just.

The person apparently closest to DeSimone, namely, Mr. Munday, who had shown an interest in and befriended him, who had made arrangements for him to visit his brother, and who had often visited with him, had no idea he was planning to escape.

Could we say that in the light of this situation that Mr. Munday should have known of a plan to escape from the mere notation in the record made one month prior to his last visit with DeSimone? To the contrary, on the date of the escape the reasonable assumption was that he would remain in the encampment, inasmuch as that course of action represented his only opportunity to visit his brother, whom he apparently highly regarded.

It is not the occurrence of the escape, but rather what condition existed prior to the escape, that is to be considered. It is foresight, rather than hindsight, that is pertinent.

Claimants also call our attention to claimants' exhibit No. 3, a social history of DeSimone, bearing date of October 14, 1953, made when he was fourteen years of age, and referring to his unfortunate home life, his running away from home, school and an orphanage as significant notice of his planned escape.

In the same light, claimants also call our attention to exhibit No. 4, dated March 22, 1954, which was a report of a staff meeting at the Reception Center at St. Charles, recommending his transfer to the Industrial School for Boys at Sheridan. This report refers to the social history, and adds thereto information that he had run away from the Illinois State Training School for Boys on three occasions, the last being March 9, 1954. These represent his record prior to his transfer to the Industrial School

where he served at least fifteen months before being transferred to the Savanna Encampment.

The only evidence before us with respect to his progress after being transferred to the Industrial School was that in the judgment of the authorities he had been rehabilitated to the extent that they felt it proper to transfer him to the open type confinement afforded by the facilities of the Savanna Encampment. Nothing appears from the evidence reflecting any reason for not making the transfer.

The Savanna Encampment, as described by Victor Robert Griffin, Superintendent of the Reception Center of the Illinois Youth Commission, was "the nearest step to parole". He further testified that the boys assigned to that institution were allowed to walk around certain areas; that there were no fences or walls; and that the degree of supervision was not designed to watch every boy every moment, but, rather, it was designed to promote an increased degree of permanence in the self-improvement of the boy.

It goes without saying that rehabilitation is the fundamental aim of the Youth Commission program. Decisions as to the placement and progress of these youths must be made by utilizing the best judgment of professional persons trained in administering this program. It is not an exact science, and cannot be administered by a slide rule. It is certain that instances will occur wherein the results of attempted rehabilitation are disappointing. Such instances by no means indicate faulty administration of the program. The duty of the State personnel in exercising the discretion required is not that of an insurer that each boy assigned to the encampment will perform satisfactorily, any more than that the parole board

should be held to guarantee that a parolee will commit no further crimes. The only duty, which is required, is one of reasonable exercise of discretion. We find that the authorities in assigning DeSimone to the encampment exercised their discretion in a reasonable manner.

Claimants in their reply brief acknowledge that "claimants do not assert that respondent was negligent in putting the boys in an open camp at Savanna". Therefore, inasmuch as the decision was properly made to transfer DeSimone to the Savanna Encampment, the type of custody to which he was to be subjected at such institution need only have been exerted in accordance with the standards applicable to others assigned to that institution.

If we were to require such an institution as the Savanna Encampment to provide maximum custody over certain boys and minimum custody over the others, it would defeat the purpose of this type of institution, and make the system unworkable.

As to Ronald Chiquet, we have considered the record, and reached the same conclusion as we did to DeSimone. Claimants make no contention that respondent had notice of his planned escape. They refer only to the fact that he had a history of burglary and larceny, and was "riddled with anxiety, guilt and hostility".

Mr. Griffin testified that Chiquet, after being assigned to the Youth Commission in November or December, 1953, was placed in the State Training School for Boys at St. Charles, and that he "responded very well in the school program . . . and it was recommended that he be transferred to a camp". The transfer was made in May, 1955. We find that he, too, was properly assigned to the encampment.

As to the escape, which occurred, the testimony of Jewel Sulser, work supervisor and one of the guards, is summarized as follows:

DeSimone and Chiquet were in bed at 9:30 P. M., at which time the lights were out. A guard, Bill Watkins, was on duty in the barrack in which the boys were quartered. This guard remained on duty all night in an adjoining room, and each thirty minutes conducted a bed check of the inmates.

Mr. Sulser was quartered in a barrack approximately forty feet from that in which DeSimone and Chiquet slept. He, Sulser, was in bed when he heard a ping pong ball on the floor in the recreation room in his barrack. He got up, looked out, and saw the two boys, who had left the barrack between bed checks, walking toward the bathroom. He called Mr. Watkins, got up, partially dressed, and, along with Watkins, went to the bathroom some three hundred feet from the barracks in an attempt to find the boys. The rules of the encampment permitted them to go to the bathroom unattended by a guard after obtaining permission.

Upon failing to discover the boys, they returned to the barracks to put on more clothes, saw the boys go around the building one hundred and twenty feet away, and on into the woods. After awakening a third man to watch the barracks, Sulser and Watkins drove an automobile after the boys, and came upon the scene of the wreck in Savanna.

The action on the part of Sulser and Watkins does not impress us as unreasonable or negligent in the light of the type of institution involved. They were not charged with caring for insane maniacs and murderers, but rather boys, who had progressed to a rehabilitated status and were practically on parole.

There is no evidence pointing toward any violation of rules by either Sulser or Watkins. The activities of DeSimone and Chiquet were in no sense of the word ignored, but on the contrary received prompt attention. Just what claimants contend should have been done by Sulser and Watkins, which was not done, does not appear. Certainly, claimants would not contend that the boys should have been shot, and it is apparent that ordering them to stop would have had no effect.

The system of guarding the boys assigned to the camp has not been questioned by claimants except to state that DeSimone should have been more thoroughly guarded. We have previously discussed this question, and held that, since he was properly assigned to the camp, the same degree of care and custody applicable to the others so assigned was all that could reasonably be required as to him for as long as he was properly assigned to the encampment.

In view of the above, we find that claimants have failed to establish a compensable case. In order to allow this claim, we would be required to hold that the State is an insurer of its wards' activities. This is not the law, and the claims must, therefore, be denied.