(No. 84-CC-2466

JUDY HENDERSON, Individually, and as Mother and next friend to MELANIE HENDERSON and WILLIAM HENDERSON, JR., and WILLIAM HENDERSON, Claimants, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed May 17, 1993.*

*Order filed October 19, 1993.*

*Supplemental Opinion filed January 25, 1994.*

KRALOVEC, JAMDOIS & SCHWARTZ, for Claimant.

ROLAND W. BURRIS, Attorney General (ROBERT J. SKLAMBERG, Assistant Attorney General, of counsel), for Respondents.

OPINION

JANN, J.

## I. Procedural History

This case arose out of a complaint filed in the Court of Claims that asserted that on March 15 and 16, 1983, the Respondents, State of Illinois and Department of Corrections, through its agents and employees at Pontiac Prison, were negligent in allowing inmate Anthony Davis to escape. The complaint further alleged that as a direct and proximate result of the escape, the Claimants were injured when inmate Anthony Davis kidnapped three of them, forced them to drive him to Chicago and forcibly assaulted and raped Claimant, Judy Henderson, in the presence of her children. Additionally, Claimants have asserted loss of consortium on behalf of William Henderson, the husband of Judy Henderson.

The claim was brought pursuant to section 1 of the Escaped Inmate Damages Act (740 ILCS 60/1) and, prior

to the hearing on this matter, the Claimants exhausted all other remedies by the filing of a complaint in the Circuit Court of Cook County, which was subsequently dismissed. On January 6, 7, and 16, 1992, evidence was heard in the Court of Claims. Additionally, an evidence deposition was taken of Dr. Paul Taylor, a psychologist, which is of record.

## II. Facts

In December of 1981, Anthony Davis (hereinafter Davis) was sentenced to 25 years at Pontiac Correctional Center for five counts of armed robbery and one count of burglary. Pontiac Correctional Center is a maximum security prison which houses approximately 1,500 inmates in the maximum security portion of the facility.

On March 15, 1983, inmates Davis and Rodney Bradley were able to leave the "chow" line and hide themselves within the prison for approximately nine hours. During the time that Davis and Bradley were hiding, at least three head counts of their gallery were performed by correctional officers Gerald Bolen and Edward Schulthes. Exhibits introduced by Claimants show that on all of these occasions the employee performing the count noted that all inmates were present when, in fact, inmates Davis and Bradley had manipulated their beds to make it appear that they were present while they were actually concealed elsewhere in the prison.

Counts performed by employees Allen Forst and Melvin Franks failed to note that the number of inmates returning from dinner matched the number who had gone to dinner. Respondent's employee Emil Wooldridge was stationed in tower 18 during the early morning hours of March 16, 1983. He failed to observe inmates Davis and Bradley during their escape. Inmate Davis climbed

over the prison walls at approximately 4 a.m. on March 16, 1983, and effectuated his escape. As a result of the incident, numerous prison employees were disciplined.

In March of 1983, the Claimants' family included William D. Henderson, Jr., Judith K. Henderson, Melanie Henderson, age 10, and William D. Henderson III, age 7. The Hendersons had resided at 1005 South Oak Street in Pontiac for about six weeks and the house was located approximately one block from Pontiac Prison.

On March 18, 1983, Judy and the two children entered the family van for the purpose of going to school. Upon entering the van, they noticed that a black male was lying in the back with a gun pointed at them. The man was wearing a prison outfit and the gun was a rifle. The man told Judy that he had someone else with him in the van and that he wanted to be driven to Chicago. While in Pontiac, Judy requested that the children be released but the kidnapper refused. The record is clear that the man with the gun was in fact Anthony Davis, the escapee from Pontiac.

Davis forced Mrs. Henderson and the children to drive to Chicago where Davis attempted to cash one of Mrs. Henderson's checks at a drive-through bank. Davis subsequently choked and raped Mrs. Henderson in front of her young children. Davis then forced Mrs. Henderson into a grocery store in another attempt to cash a check. Mrs. Henderson was able to escape with the aid of a store security guard and Davis was apprehended. He was convicted of rape, kidnapping and assault for which he received a sentence of natural life.

Mrs. Henderson and her children were treated at Michael Reese Hospital. Dr. Paul Taylor, a clinical psychologist, provided services to Mr. & Mrs. Henderson

and the children in 1983 and in 1991. Medical bills submitted total $2,389.75. Property damage for repairs to the van were $166.20.

## III. Negligence

The facts summaried above are not disputed. Our primary task is to determine whether Respondent was negligent by acts of commission or omission in allowing Davis to escape and thereby becomes liable for damages to Claimants.

We have consistently held that the State is not strictly liable in cases involving escapees. (*American States, Inc. v. State*, 23 Ill. Ct. Cl. 47.) Similarly, the State is not an insurer of actions involving escaped inmates. (*Voll v. State* (1979), 33 Ill. Ct. Cl. 201.) In order for Claimants to recover, it must be shown that the State was negligent. *Johnson v. State* (1981), 34 Ill. Ct. Cl. 234.

The record in this case is extensive and includes numerous documents prepared by the Department of Corrections as a result of their investigation of Davis' and Bradley's escapes. Ten employees were disciplined. Of the 10, several were terminated (some were eventually reinstated with suspensions).

The current warden of Pontiac, Richard Gramley, testified that he had carefully reviewed the records of the incident which occurred prior to his becoming warden at Pontiac. The following exchange was part of Claimant's cross-examination of Gramley:

"Q. (By Mr. Schwartz) Do you have any opinions as to how it was that Anthony Davis was able to escape?

A. It appears as though a number of individuals deviated from established procedures policy, did not properly do what they were supposed to do, failed to do what they were supposed to do, and as a result of this the inmate was able to create a breach in security and was able to escape and there were a number of individuals and a variety of different actions."

In response to a question by the attorney general, the Warden testified as follows:

"Q. (By Mr. Sklamberg) Do you feel that Anthony Davis' escape in 1983 could have been prevented?

A. Based on what I have read if certain staff had done their job, had followed their procedures as they had been trained to do and as they were supposed to do, yes, sir, it could have been prevented."

The record shows that numerous head counts dictated by prison procedures and policies in effect at the time were performed incorrectly. Additionally, the two employees stationed in the towers nearest the wall where the prisoners escaped were either asleep or inattentive.

Respondent argues that the State cannot be held liable as Davis' record while incarcerated gave no indication that he was an escape risk and his actions were not foreseeable.

We find this argument without merit as applied to the facts at hand. The testimony and evidence adduced at hearing clearly illustrated that numerous testing and review procedures were enacted by the Department of Corrections to identify persons who might be deemed serious escape risks. Although Davis had not exhibited behavior which would have identified him as an escape risk, we find no fault with the failure of the system to so identify him. By the very nature of the institution, it must be assumed that a person incarcerated may try to escape if given opportunity. Respondent introduced proof of Pontiac's extremely low escape record to bolster its argument that the escape was not foreseeable. While we agree Pontiac's record is excellent, we are not persuaded of the unforeseeability of this escape. Davis' escape was made possible by the failure of security personnel to properly perform their duties. When procedures established to prevent escape are not followed and security is breached

it follows that escape is foreseeable. We find Respondent negligent in allowing Davis' escape.

### IV. Damages

There is clear evidence that Davis' escape was the direct and proximate cause of Claimant's injuries. The Respondent argues that because Claimants resided about one block from the prison there was an assumption of risk and contributory negligence as regards the possibility of an escape. We disagree. To adopt such a theory would make the siting of prisons in any but the most remote, unpopulated regions impossible. The State owes its citizens a duty to run its prisons in a reasonable manner and act with due care to prevent escape of prisoners in their care.

There was no dispute as to medical and property damage bills introduced into the record. Medical bills totalled $2,389.75 and property damage to the van was $166.20. We hereby award $2,389.75 to Judy Henderson for medical expenses and $166.20 for property damage.

Mrs. Henderson, Mr. Henderson, Will Henderson and Melanie Henderson testified to the physical and emotional damages they have endured as a result of this escape, kidnapping and assault. All four family members were evaluated by Dr. Paul Taylor in 1983 and again in 1991. Dr. Taylor's evidence deposition was taken in December of 1991. Although certain objections to various elements of the deposition were made by both parties during the deposition, the deposition was made part of the record at hearing.

Dr. Taylor's deposition discloses that he saw the family members individually in 1983 within approximately six months of the incident. He did not keep notes of these initial meetings apparently because the family's attorney had asked him to make an analysis based upon a relatively

brief examination process which Dr. Taylor felt was not possible at that time.

Dr. Taylor began seeing the Hendersons again in 1991. Most were seen five or six times over a few months. Each family member was given a battery of tests used in evaluating persons embarking on a course of therapy. Although Dr. Taylor opined that additional sessions with each of the Hendersons would have been helpful in making more precise diagnoses, he felt each of the Hendersons had suffered distress in varying degrees from the trauma of the 1983 incident. Dr. Taylor recommended a two-year course of weekly therapy for each of the Claimants and the prescription of anti-depressant drugs. Dr. Taylor estimated the cost of therapy at $3,000 to $4,000 per year, per patient and the cost of anti-depressants at from $45 to $120 monthly.

Respondent asserts that Claimants had a duty to mitigate damages and failed to do so by seeking counseling services only for purposes of litigation. Claimant Bill Henderson admitted he had no interest in pursuing therapy. Dr. Taylor's statements regarding Melanie and Will also indicate no desire for therapy independent of this case. Mrs. Henderson testified that therapy was beyond the family's means in the years after the incident but expressed no desire for help now. While we do not agree that Claimants must seek therapy to mitigate damages, we feel Claimants have failed to sustain their burden of proof as regards an award of damages for future therapy. There is no evidence that Claimants desire additional therapy at this time.

Claimants Judy, Melanie and Will Henderson have made claims for pain and suffering. We feel awards are appropriate based upon the horrifying nature of this case and the testimony herein.

We hereby award Judy Henderson $50,000 compensatory damages for pain and suffering and $20,000 compensatory damages as mother and next friend of William Henderson III. We award $20,000 compensatory damages to Melanie Henderson, who has now reached majority.

William Henderson, Jr. seeks compensation for loss of consortium. Mr. and Mrs. Henderson's testimony clearly demonstrated that the kidnapping and assault have affected their marriage negatively and have made normal relations virtually impossible. We hereby award William Henderson, Jr. $20,000 compensatory damages.

This cause coming on to be heard on the motion of Claimants for rehearing, it is hereby ordered that: the clerk is directed to set this cause for oral argument on the next available date.

It is further ordered that a voucher be processed in the amount of $20,000 to William Henderson, Jr. consistent with the court's order of May 17, 1993, there being no issues in dispute regarding said Claimant.

## SUPPLEMENTAL OPINION

Frederick, J.

On May 17, 1993, the Court rendered its opinion in this cause. The Court found in favor of all Claimants as to liability and awarded Judy Henderson $50,000; William Henderson, Jr., $20,000; Melanie Henderson, $20,000; and William Henderson III, $20,000. Judy Henderson, Melanie Henderson, and William Henderson III petitioned for rehearing. William Henderson, Jr. accepted his award and did not request a rehearing. The Court heard oral argument on the petition for rehearing.

The Court has seriously considered the parties' arguments as to the issues of future pain and suffering and future psychological treatment. Based on our review of the transcripts, the pleadings, the Court's prior opinion, and the oral arguments, we are constrained to find that the petition for rehearing should be allowed. The Claimants should be awarded significant amounts for future pain and suffering and future psychological expenses based on the evidence in this case.

Based on the foregoing and based upon our review of the entire proceeding, we modify our prior award in the Court's opinion of May 17, 1993. We hereby award Judy Henderson the sum of $100,000 to compensate her for compensatory damages, future pain and suffering, and future psychological expenses. We hereby award William Henderson III the sum of $65,000 to compensate him for compensatory damages and future damages. We hereby award Melanie Henderson the sum of $65,000 to compensate her for compensatory damages and future damages.